**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| iSENSE, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 1:23-cv-11981 |
| v. | ) |
| | ) Judge Mary M. Rowland |
| THE BOARD OF TRUSTEES OF THE | ) |
| UNIVERSITY OF ILLINOIS, | ) |
| | ) |
| Defendant. | ) |

## FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff iSense, LLC ("**iSense**"), for its complaint against defendant The Board of Trustees of the University of Illinois (the "**University**"), states and alleges as follows:

## NATURE OF THE ACTION

1. Dr. Paul Rhodes, Professor Ken Suslick, and Dr. Sung Lim co-founded iSense, LLC in 2008 to further develop and commercialize unique sensor technology invented by Professor Suslick and others at the University of Illinois that enabled low cost printed arrays of chemically diverse sensors which sensitively respond to volatile mixtures with changes in color.

2. In concert with its formation, on June 17, 2008 the University granted iSense an exclusive license regarding certain Patent Rights pursuant to an Exclusive License Agreement (as amended, the "**License Agreement**").[1] The License Agreement authorized iSense to, among other things, develop and commercialize certain Technology based on those Patent Rights. For over a decade, iSense has worked diligently to do so, securing governmental grants and contracts, and has paid the University at least $783,000 under the License Agreement.

---

[1] Capitalized terms used in this paragraph are defined elsewhere in this Complaint.

1

3.    As another means of fostering the commercialization of the Technology, and as explicitly contemplated by Section 2.3 of the License Agreement, iSense issued sublicenses, including one to Specific Technologies, LLC (later renamed Specific Diagnostics, LLC, "**Specific**"), which was formed in 2011 to develop the Technology in the area of microbiology diagnostics.  The University was aware of Specific and its sublicense and for years had raised no issue regarding the sublicense with either iSense or Specific.  In September 2019, however, Specific publicly announced that it had secured $12.5 million in private equity funding.  iSense is informed and believes that, shortly thereafter, the University began to develop a strategy to gain access to Specific as a direct licensee, since it perceived Specific as a more promising and successful entity than iSense, and believed that a direct licensing relationship with Specific would be more lucrative for the University.  In order to achieve the goal, the University began a campaign to manufacture a pretextual and improper basis to purportedly terminate the License Agreement with iSense, despite the fact that iSense has performed all of its material obligations under the License Agreement at all relevant times.

4.    The University's wrongful actions have caused iSense irreparable harm.  The rights afforded to iSense pursuant to the License Agreement involve unique intellectual property, which iSense cannot replace.  Accordingly, iSense seeks a declaratory judgment resolving the controversy between iSense and the University regarding the status of the License Agreement declaring that (i) the University's purported termination of the License Agreement was improper and without effect; (ii) the License Agreement remains in full force and effect; and (iii) that any purported termination of the Specific Sublicense (defined below) as a result of the University's purported termination of the License agreement is without effect, and that the Specific Sublicense remains in full force and effect, ensuring Specific the rights it has enjoyed since the inception of

the Specific Sublicense. iSense also seeks specific performance of the License Agreement and declaratory judgement that the University breached the implied covenant of good faith and fair dealing.

## THE PARTIES

5.     iSense is a Florida limited liability company, whose place of corporate registration, venue for receipt of notices, financial and administrative office is in Florida. The sole member of iSense is a citizen of Florida. No member of iSense is a citizen of Illinois.

6.     The University is a body corporate and politic of the State of Illinois, with its principal place of business in Illinois, and is, therefore, a citizen of Illinois. Through its Office of Technology Management, the University grants licenses to enable others to use and exploit the University's patent rights for commercial purposes.

## JURISDICTION AND VENUE

7.     Jurisdiction in this Court is proper under 28 U.S.C. §1332(a) because the parties are citizens of different states and the matter in controversy exceeds the value of $75,000, exclusive of interest and costs.

8.     Venue in this Court is proper under 28 U.S.C. §1391(b)(1) and (d) because defendant resides within this district, and because License Agreement Section 8.6 specifies that the parties have agreed to litigate disputes involving the License Agreement in either local, state or federal courts in Illinois. Further, iSense is informed and believes that a majority of the members of the Board of Trustees of the University reside in this district, and that the Board of Trustees regularly meets in this district.

3

## STATEMENT OF FACTS

### The License Agreement

9.     The University and iSense entered into the License Agreement effective as of June 17, 2008.

10.     In the License Agreement, the University granted iSense (among other things) the exclusive right (i) to use all of the University's rights in certain patents and patent applications (the "**Patent Rights**"), as identified in the License Agreement, "to identify, develop, make, have made, use, import, export, lease sell, have sold and offer for sale, Products" within all fields of use (the "**Technology**") throughout the world, and (ii) "to grant Sublicenses of the rights granted" under the License Agreement.

11.     In exchange for its exclusive rights under the License Agreement, iSense agreed to make certain payments to the University. To date, iSense has made payments to the University totaling at least $783,000.

12.     The License Agreement also sets forth certain reporting requirements, including reporting to the University on iSense's plan for developing and marketing commercial products that utilize the Patent Rights.

13.     The License Agreement was amended four times: a first amendment (executed on July 13, 2010), a second amendment (executed on March 27, 2013), a third amendment (executed on February 1, 2015 via email), and a fourth amendment (executed on June 17, 2016 and via email), which included specific provisions modifying the license fees, royalties, and annual minimums and waiving certain late payment fees.

## Dispute Resolution Provisions Under the License Agreement

14.     Section 8.16 of the License Agreement provides as follows:

8.16 Dispute Resolution. The Parties agree to resolve any disputes or disagreements that may arise during the course of this Agreement as follows:

> (3)     The affected Party shall promptly notify the other Party (the date of such notice being the "Notice Date"), and senior management of both parties will meet to attempt in good faith to resolve the dispute or disagreement within thirty (30) days of the Notice Date.  For University, senior management shall be the Director of the Office of Technology Management.

> (2) If no resolution is reached by senior management, either party may request a one-day meeting with a mediator to be held within sixty (60) days of the Notice Date. The venue for such mediation proceeding, the responsibility for paying the costs of the mediation, the selection of the mediator and the issues to be mediated will be negotiated in good faith by the parties on a case-by-case basis.

> (3) If no resolution is reached by the parties as a result of such mediation, either party may submit the dispute to a court of competent jurisdiction pursuant to Section 8.6.

15.     As described further below, disputes have arisen between iSense and the University.  However, despite repeated written requests from iSense, the University refused to comply with the dispute resolution requirements of the License, and wrongfully purported to terminate the License Agreement without complying with those dispute resolution requirements, leaving iSense no other recourse than to file the present action in order to restore and protect its interests.

## iSense Develops the Technology and Issues Sublicenses

16.     Since 2008, iSense has vigorously pursued multiple avenues for commercial development of the Technology and has met its payment obligations, including the minimums and patent prosecution cost shares within cure periods specified in the License Agreement.  iSense has been awarded over $12 million in government grants and military contracts and subcontracts to

5

fund development of Technology in various fields of use utilizing one or more of the Patent Rights. That funding has helped to enable the development of the Technology, and the value of those efforts have been destroyed by the University's actions as alleged herein.

17.    iSense's efforts have resulted in technological advances, directly and by its sublicensees (discussed below).  For example, one sublicensee, Specific, earned a Breakthrough Device designation by the FDA.  iSense's advances include developing technologies that enable critically important applications such as rapid antibiotic susceptibility testing of blood infections and the non-invasive prostate cancer detection.

18.    The value of the Technology that iSense developed and/or owns as a result of its exclusive rights under the License Agreement, as well as the amounts iSense anticipates earning under the sublicense agreements described below, significantly exceeds $75,000.  Indeed, iSense was heavily reliant on the Patent Rights as a source of technology development and revenue.  The University's unilateral and improper purported termination of the License Agreement has deprived iSense of its rights under the License Agreement and has caused iSense irreparable harm.

### The Sublicense and Sublicensees

19.    The License Agreement expressly permits, indeed encourages, iSense to enter into sublicenses in order to advance the commercialization of the Technology.  iSense has primarily focused on military and consumer applications of the Technology.  Consistent with the License Agreement, and to foster commercialization of the Technology, iSense entered into two sublicenses: one with iSense Medical Corp. d/b/a Metabolomx ("**IMC**") (which focuses on detection of cancer from breath and urine), and another with Specific (which focuses on applications in microbiology diagnostics).  Neither IMC nor Specific existed at the time the License Agreement was entered into.

6

20.     iSense and IMC entered into a sublicense agreement effective as of April 6, 2010 (the "**IMC Sublicense**").  IMC's pursuit of cancer detection technology earned it over $1,000,000 of NIH grant funds from the National Cancer Institute, and studies were done and published with world-leading researchers at the Cleveland Clinic on the detection of lung cancer from breath and the detection of prostate cancer from urine, and other profoundly important applications.  IMC currently has a pending study at Stanford University on the non-invasive detection of prostate cancer from the outgas of urine, the fulfillment of which is among the many important opportunities created by iSense's efforts under the License which have been undermined and irreparably harmed by the University's breach of the License Agreement described below.

21.     On or about May 11, 2011, in a continuation of its effort to foster the commercialization of the Technology, iSense granted a sublicense to Specific, memorialized in a written agreement in 2015, subsequently modified by the parties thereto from time to time (the "**Specific Sublicense**").  The Specific Sublicense enabled Specific to pursue development and commercialization of the Technology in the field of microbiology diagnostics.  In the 10 years that followed, Specific ultimately became very successful, first earning a series of NIH grants and then private equity and strategic investor funding, and brought to market a new device enabling far more rapid determination of the effective antibiotic to give a patient suffering from a life-threatening blood infection than the current standard of care in the United States.  This revolutionary new technology earned Breakthrough Device designation from the Food and Drug Administration.

### iSense's Relationship with the University

22.     Since the inception of the License Agreement, iSense has regularly reported to the University regarding its efforts to develop and commercialize the Patent Rights and related

Technology, both directly and indirectly through the efforts of its sublicensees IMC and Specific. That reporting has been done both formally and informally, and in both verbal and written form. The University Office of Technology Transfer ("**TTO**") personnel were well aware of the formation of and leadership of IMC and Specific.

23. For over eight years prior to the late Fall of 2019, the University and iSense generally had a strong and cordial working relationship. For example, in connection with that working relationship, the parties amended the License Agreement two times (in 2010 and 2013) via formal written agreement and further amended the License Agreement in writing via email two additional times (in 2015 and 2016).

24. At the time the original License Agreement was signed in 2008, iSense was a fledgling startup company. Nevertheless, at all relevant times iSense had paid its contractually required amounts to the University either on time, or within the applicable cure periods specified in the License Agreement. To date, iSense has paid at least $783,000 to the University under the License Agreement.

25. By no later than 2013, the University knew of the existence of Specific, its relationship to iSense, and information regarding Specific's management, which is evidenced by emails the University received as well as iSense commercialization reports of the sublicense issued to Specific that were provided to the University. Indeed, the University lauded iSense's efforts to commercialize the technology associated with the License Agreement by way of sublicenses like the one iSense entered into with Specific.

26. Until at least late Fall 2019, the University never questioned or raised any concerns regarding the existence of Specific, or iSense's sublicense agreements with IMC and Specific. iSense and its investors, employees, grant issuers and other stakeholders operated in reliance on

the University's acknowledgement and acceptance that Specific was a sublicensee, and that Specific's duties and rights were governed by the sublicense with iSense rather than the License Agreement.

27.     However, many years after the University became aware of Specific and its relationship to iSense, in September 2019, Specific issued a press release announcing it had received private equity funding of $12.5M.  Shortly after that announcement, iSense is informed and believes that personnel at the University, including personnel within the University's Office of Technology Management ("OTM"), began to develop a strategy to pretextually and improperly terminate the License Agreement.  The motivation for the University's about-face was its desire to obtain a larger and more direct share of the potential financial opportunity presented by Specific, rather than be limited by its direct license with iSense, which the University began to view as the less desirable licensee.  Rather than honor the bargain it made with iSense—on which iSense, Specific, and their stakeholders had relied for years—the University pursued the goal of achieving a direct license with and equity stake in Specific, causing iSense irreparable harm in the process.

**The University Demands Payments From iSense, Which iSense Promptly Provides**

28.     Communication from the University OTM fell off during Covid, but resumed in March of 2021.  The University was apparently frustrated that it did not yet have direct license access to Specific, and sent iSense a purported default letter dated March 29, 2021, which included the demand that iSense pay $320,000 in License minimums (the "**March 29 Letter**").  On April 28, 2021, iSense paid $320,000, as requested in the March 29 Letter and within the 45 day cure period specified in Section 7.2(b) of the License Agreement, and asked that the

University calculate and notify iSense of the amount of any interest due so that could be paid as well.

29.     By email dated April 29, 2021, the University acknowledged receipt of the $320,000 from iSense and thanked iSense for the payment.  The University did not, at that time or any other, respond to iSense' request for a computation of interest requested by the University.  Indeed, in the June 17 Letter described below, the University did not claim that iSense was in default for failing to pay interest or any other amounts related to the Annual Minimum Payments beyond the demanded $320,000 which iSense had already paid.

**<u>After iSense Timely Provides the Demanded Payments, the University Attempts to</u>**

**<u>Create New Pretexts to Terminate the License Agreement</u>**

30.     Despite iSense's prompt and timely payment of the $320,000 demanded in the March 29 Letter, (bringing iSense's total payments to the University to at least $783,000), and with no further communication in the interim, on June 17, 2021 the University sent a letter purporting to notify iSense of additional defaults ("**June 17 Letter**"), and asserting new pretextual grievances as part of the University's strategy to improperly terminate the License Agreement.

31.     In the June 17 Letter, the University claimed, for the first time ever, that iSense was in default under the License Agreement because it supposedly failed to attain a certain level of "Net Sales" purportedly required by the License Agreement.  The June 17 Letter was the first time that the University expressed any interest in or concern about that issue.  Following the receipt of the June 17 Letter, iSense promptly provided bank statements to the University evidencing iSense's compliance with all requirements of the License Agreement.

**The University Refuses to Comply with the**

**Dispute Resolution Requirements of the License Agreement**

32.     After iSense received the June 17 Letter, it sent an email on June 22, 2021 to the Director of the University's OTM ("**June 22 Email**") specifically requesting that the University follow the dispute resolution process set out in Section 8.16 of the License Agreement ("**Dispute Resolution Provision**").  The June 22 Email requested that "Per Provision 8.16 [of the License Agreement], we recognize that there is a dispute as to whether a default exists, and so, following the guidance there, we would like to meet in good faith with . . . the Director of OTM Mr. Hoffman."  iSense offered to have its CEO and COO travel to Illinois for an in-person meeting to attempt to resolve the dispute in good faith.

33.     On June 24, 2021, the University responded and refused to engage in the Dispute Resolution Provision procedures, incredibly claiming that no meeting was required because "[t]here is no dispute," notwithstanding the fact that the University had sent a letter seven days earlier claiming that iSense was in default of the License Agreement.

34.     On or about July 29, 2021, iSense again rebutted the University's transparently pretextual allegation of default, and again requested that the University meet with iSense pursuant to the Dispute Resolution Provision as required under the License Agreement.

35.     Notwithstanding iSense's multiple requests, the University again refused to meet with iSense in violation of the Dispute Resolution Provisions of the License Agreement.  The University's repeated failure to comply with those Dispute Resolution Provisions confirms that its correspondence regarding a purported default by iSense was a pretextual attempt to generate a basis to improperly terminate the License Agreement so that the University could pursue what it perceived to be a more lucrative direct licensing arrangement with Specific.

**The Purported Termination Letter**

36.     By letter dated August 5, 2021 to iSense ("**August 5 Letter**"), the University purported to terminate the License Agreement.  Presumably because iSense had refuted the University's prior attempts to pretextually terminate the License Agreement, in the August 5 Letter the University added a new claim that iSense had made a "materially false report," which according to the University entitled it to terminate the License Agreement without any opportunity for iSense to cure.  As discussed below in Paragraphs 43-44, iSense promptly responded to the August 5 Letter and provided information demonstrating that the University's new claim of a "false report" was demonstrably false and constituted a breach of the University's implied covenant of good faith and fair dealing in carrying out the License Agreement.

37.     In the August 5 Letter, the University also incredibly claimed that iSense failed "to pay interest on the Annual Minimum owed," completely ignoring that iSense had asked the University to provide a computation of interest allegedly owed in May 2021 so that iSense could pay it, and ignoring that the University had failed to do so.  The University's attempt to manufacture a default by iSense after iSense had already offered months earlier to pay interest if the University provided a calculation, and the University failed to do so, serves as additional confirmation that the August 5 Letter was yet another attempt to improperly and pretextually manufacture a basis to terminate the License Agreement without any proper justification.

38.     The University also claimed in its August 5 Letter that iSense was in default because it failed "to provide evidence that Specific [and IMC] are anything other than Affiliates." This is a baseless rationale for the University to claim that iSense was in default, including because the License Agreement does not require iSense to "provide evidence" to the University to demonstrate whether a sublicensee is or is not an "Affiliate."  It was not and cannot be a breach of

12

the Agreement to fail to provide such evidence when the License Agreement does not require it to be provided. Tellingly, the University cited no provision of the License Agreement in the August 5 Letter that purportedly required iSense to "provide evidence" regarding whether Specific was an Affiliate.

39.     Further, as discussed above in Paragraphs 25-27, the University had been made aware in writing of Specific's formation, Specific's management, and its status as a sublicensee of iSense over six years earlier, and the parties had operated with Specific as a sublicensee during that time. That course of dealing confirms that iSense's sublicense to Specific was permitted under the terms of the License Agreement.

40.     Further, based on the University's subsequent conduct, iSense is informed and believes that the University misrepresented or concealed material facts about its unsupported position that Specific was not a proper sublicensee under the License agreement. iSense is further informed and believes that the University knew that its prior representations and conduct to iSense with respect to the Specific sublicense were false and misleading. iSense did not know that the University's representations and conduct were false when they were made and when iSense acted on them nor did iSense have any reason to believe it was false, and iSense reasonably relied on the University's representations in good faith to iSense's detriment. iSense is informed and believes that the University intended or reasonably expected iSense to act on its representations and conduct regarding the Specific sublicense. iSense has also been prejudiced by its reliance on the University's representations regarding Specific, including through the purported termination of the License Agreement by the University and lost revenue and irreplaceable Patent Rights as a result of that purported termination. Accordingly, the University is estopped from asserting that iSense's sublicense to Specific did not comply with the License Agreement.

41.     As referenced above, the August 5 Letter also claimed "documentation received from iSense on July 30, 2021 showed a materially false report in the form of the falsified agreement and signature between iSense and iSense Medical Corp dba Metabolomx Technologies, LLC," and that "[p]ursuant to Section 7.2(c) of the Agreement, the Agreement is terminated as of this notice, and there is no opportunity to cure."

42.     The University's "materially false report" allegations were erroneous for multiple reasons and iSense had not violated the License Agreement.  First, the materials provided by iSense that led to the purported termination under Section 7.2(c) were not a "report."  Even if they were materially false (they were not), providing those materials did not permit the University to terminate under Section 7.2(c).

43.     Tellingly, the University provided no explanation in the August 5 Letter for why the materials provided by iSense were allegedly "materially false."  After iSense counsel pressed the University for an explanation, on August 26, 2021 the University identified the basis for its "materially false report" allegation in the August 5 Letter, raising absurd complaints, such as the fact that different signatures on a sublicense that iSense had provided were written in different colors (because one signature was electronic).

44.     Counsel for iSense provided a detailed rebuttal to each of the points raised by the University in a September 3, 2021 letter to the University, and again requested that the University meet with iSense to attempt to resolve their disputes as required by the Dispute Resolution Provision of the License Agreement.  Again, the University refused to comply with the Dispute Resolution Provision, further confirming that its goal was to pretextually and improperly terminate its license with iSense, regardless of whether it had a contractual right to do so.  Tellingly, the

University never responded to substantively respond to or dispute any of the rebuttals provided by iSense's counsel on September 3, 2021.

45.     Section 7.2 of the License Agreement provided limited circumstances under which the University could terminate the License Agreement.  None of those circumstances occurred, and the University failed to justify that any of the pretextual bases it raised in the August 5 Letter had any basis or support.

46.     In its August 5 Letter, the University claimed that, as a result of its purported termination, iSense and its sublicensees, including Specific, "no longer have any rights to use or exploit in any way the University's Patent Rights licensed in the [License] Agreement pursuant to Section 7.4 of the Agreement," putting at risk 13 years of iSense's work, including the value of the productive sublicenses iSense had issued and nurtured.

47.     Following the purported termination of the License Agreement, the University's conduct confirmed that its efforts to terminate the License Agreement were a pretextual effort to gain access to Specific as a direct licensee.  In particular, the University entered into a direct license agreement with Specific, which included a $2,566,000 payment to the University.

## COUNT I

## DECLARATORY JUDGMENT – BREACH OF CONTRACT

48.     iSense realleges and incorporates by reference its allegations set forth in paragraphs 1-47 of this Complaint.

49.     The License Agreement is a valid contract between iSense and the University.

50.     iSense substantially performed its obligations under the License Agreement at all relevant times.

51.     The University has claimed that it terminated the License Agreement due to purported uncured defaults and "false reports" by iSense.  Those assertions are false, and the University's purported termination was entirely pretextual and unjustified.  Any purported breaches by iSense were immaterial and readily curable, and were timely cured by iSense.  iSense never provided any materially false report to the University, and the materials that the University identified as allegedly constituting a "materially false report" were neither false nor a "report."  iSense has not breached the License Agreement in any way, materially or otherwise.  Section 7.2 of the License Agreement provided limited circumstances under which the University could terminate the License Agreement, and none of circumstances occurred.  Thus, the University was not contractually permitted to terminate the License Agreement, and the University's purported termination constitutes a breach of the License Agreement by the University.

52.     There is a real, actual, and justiciable controversy between iSense and the University regarding whether the University has grounds to terminate the License Agreement and/or as to whether the License Agreement has, in fact, been terminated.

## COUNT II

## DECLARATORY JUDGEMENT – BREACH OF CONTRACT

53.     iSense realleges and incorporates by reference its allegations set forth in paragraphs 1-52 of this Complaint.

54.     The License Agreement is a valid contract between iSense and the University.

55.     iSense substantially performed its obligations under the License Agreement at all relevant times.

56.     The Dispute Resolution Provision (Section 8.16 of the License Agreement) requires among other things that, upon request of either party, any "disputes or disagreements" between

iSense and the University first be addressed in a meeting of senior management of both parties, and thereafter, if necessary, in a one-day mediation. That provision requires good faith efforts by both parties to meaningfully meet and confer to attempt to resolve any disputes concerning performance or non-performance in order to avoid the unnecessary time, expense, and distraction associated with litigation.

57.    iSense sent multiple requests to the University pursuant to the Dispute Resolution Provision, seeking a meeting between the senior management of iSense and the senior management of the University to attempt to resolve their disputes under the License Agreement, including iSense's alleged defaults under the License Agreement, and the University's purported termination of the License Agreement.

58.    The University repeatedly failed and refused to comply with its obligations to meet with iSense and otherwise comply with the Dispute Resolution Provision.

59.    To the extent any disputes remain between the University and iSense after resolution of Count I, there is a real, actual, and justiciable controversy between iSense and the University regarding whether the University must comply with Dispute Resolution Provision.

## COUNT III

## BREACH OF CONTRACT – SPECIFIC PERFORMANCE

60.    iSense realleges and incorporates by reference its allegations set forth in paragraphs 1-59 above.

61.    The License Agreement is a valid contract between iSense and the University.

62.    iSense performed its obligations under the License Agreement at all relevant times.

63.    As set forth above, the University has breached the License Agreement by, *inter alia*:

a. Failing to follow the agreed and specified Dispute Resolution Provision set forth in Section 8.16 of the License Agreement, including refusing to engage in a good faith meeting with iSense and refusal to engage in mediation;

b. Performing in bad faith and without fair dealing by exercising judgement conferred by the License Agreement in such a manner as to evade the spirit of the bargain and/or to deny iSense the expected benefit of the License Agreement, lacking diligence, and willfully rendering imperfect performance; and

c. Ignoring a course of performance and dealing, where the University allowed iSense to, among other things, enter into a sublicense with Specific.

64. As a result of the University's breaches, iSense has suffered and continues to suffer irreparable harm that renders legal remedies inadequate. The rights afforded iSense under the License Agreement, including Patent Rights, are unique and cannot be obtained by alternative means.

65. iSense is entitled to an order directing the University to specifically perform its contractual obligations under the License Agreement.

66. The irreparable harm that would be caused by the University's continued refusal to perform its contractual obligations can and would be minimized by an order of this Court directing the University to enjoy its rights under the License Agreement that it was able to rightfully enjoy prior to the University's improper purported termination of the License Agreement.

67. iSense has no adequate remedy at law.

## COUNT IV

**DECLARATORY JUDGMENT – BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

68.     iSense realleges and incorporates by reference its allegations set forth in paragraphs 1-67 above.

69.     Upon execution of the License Agreement, the University provided iSense an implied covenant of good faith and fair dealing thereunder.

70.     The University's conduct as alleged above violated the implied covenant of good faith and fair dealing.  Those violations include, *inter alia*: (1) the University's pretextual and meritless claims that iSense had purportedly breached the License Agreement and/or that the University had grounds for termination; (2) the University's August 5 Letter purporting to terminate the License Agreement without any basis for doing so; (3) the University's failure to provide iSense with adequate written notice of the basis for the August 5 Letter; and (4) the University's failure to comply with the Dispute Resolution Provisions of the License Agreement.

71.     As evidenced by the conduct described in paragraphs 1-47 above, the University has unreasonably withheld cooperation in the exercise of the License Agreement.

72.     As evidenced by the conduct described in paragraphs 1-47 above, the University has acted capriciously and in bad faith in its exercise of the License Agreement.

73.     iSense has been harmed by the University's breach of the implied covenant of good faith and fair dealing, and such breach has substantially impaired the value of the License Agreement.

74.     iSense is entitled to specific performance based on the University's breach of the implied covenant of good faith and fair dealing, in seeking to terminate the License Agreement without cause for termination.

**PRAYER FOR RELIEF**

WHEREFORE, iSense respectfully requests that this Court enter judgment in favor of iSense and against the University and render the following relief:

A.  Declaring and adjudging that the University's purported termination of the License Agreement was a breach of the License Agreement by the University, and is null and void;

B.  Declaring and adjudging that the License Agreement has not been terminated and remains in full force and effect;

C.  Declaring and adjudging that all sublicenses under the License Agreement, including the Specific Sublicense, have not been terminated and remain in full force and effect, ensuring Specific the rights it has enjoyed since the inception of the Specific Sublicense;

D.  Declaring and adjudging that the University must comply, in good faith, with the Dispute Resolution Provision set forth in Section 8.16 of the License Agreement by meeting with iSense to attempt to resolve any disputes, including, but not limited to, any disputes concerning whether iSense is in default of its obligations under the License Agreement, whether iSense failed to timely cure any defaults, whether iSense submitted any "false reports" to the University, and whether the University is entitled to terminate the License Agreement, and, if such meeting fails to resolve such disputes, by participating in the required mediation;

E.  Declaring and adjudging that the University has breached the implied covenant of good faith and fair dealing;

F.      Entering an order directing the University to specifically perform its obligations under the License Agreement, including those concerning the Patent Rights;

G.      Awarding iSense all costs of suit, including reasonable attorney's fees, to the maximum extent permitted by law; and

C.      Granting such further relief as the Court deems just and proper.

Dated: October 13, 2023

Respectfully submitted,

/s/ Kenneth G. Schuler
Kenneth G. Schuler (Illinois Bar No. 6226036)
ken.schuler@lw.com
LATHAM & WATKINS LLP
330 North Wabash Ave, Suite 2800
Chicago, Illinois 60611
Tel: (312) 876-7700
Fax: (312) 993-9767

David F. Kowalski (*pro hac vice*)
david.kowalski@lw.com
LATHAM & WATKINS LLP
12670 High Bluff Drive
San Diego, CA 92130
Tel: (858) 523-3947

Christine I. Nam (*pro hac vice*)
christine.nam@lw.com
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Tel: (212) 906-4576

*Attorneys for Plaintiff iSense, LLC*